The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Catherine E. Zienoff presiding. Good morning. This is 4-250315, People of the State of Illinois v. Aaron D. Ellis. Counsel, good morning. Would Counsel for the Appellant identify yourself, please, for the record? James Waller for Aaron Ellis. And Counsel for Appellee? John Barrett, arguing on behalf of the People of the State of Illinois. Thank you very much. Mr. Waller, you may begin your argument. Thank you. May it please the Court and Counsel. My name is James Waller. I'm with the Appellate Defender's Office, and it's my pleasure to represent Aaron Ellis before you here today. We're here because Mr. Ellis was denied his right to a fair trial when the state's proof of identity depended on three evidentiary errors that reinforced each other. First, the state proved its case with selected jail-over-here excerpts, even though the trial court could not evaluate the missing context, defense could not test the full recordings, and no witness could authenticate the excerpts as complete and fair representations of the conversations. Second, the state was allowed to introduce evidence of an unrelated district shooting, even though the Davenport shooting already supplied the firearm identity link that the state claimed it needed. And third, the state was allowed to have a police officer certified as an expert in street slang, giving the jury a law enforcement narrator for ordinary conversations. I intend to focus on these issues and to stand on the briefing for Issue 4 unless the Court has questions about that. Now, starting with the first issue, the over-here evidence should not have come in because the basic safeguards that make recorded evidence reliable were missing. First, I'd like to address something I should have maybe discussed more in the briefs. The state is not wrong that there are some conflicting comments about what recordings the defense ever received, but there's no question that it received a curated subset of what was gathered. At the suppression hearing, after Detective Meyerson testified that he received only a scrubbed, winnowed, and limited set of recordings from the FBI, Defense Counselor Mr. Spate said that he listened to over 60 hours of video wiretaps and did not hear the statements that Mr. Meyerson testified about hearing. That is out of about six or seven days of recording, over 160 hours. I think the state's formulation was 144 hours. Even if the recordings only ran during waking hours, we're talking about 50 or 100 hours of context that was missing, but the post-trial proceedings really cast even those statements by Mr. Spate into doubt. After the Court ordered the state, post-trial, to tender to Successor Counsel Mr. Wolfe all of the recordings that it had received from the FBI, Mr. Wolfe put on the record that Defense Counsel received about 33 minutes, and that was not contested at that point by Special Prosecutor Mr. Barnard. There is no dispute that the police, and thus the state, received a curated and scrubbed subset of recordings made by the FBI. Now, I believe... Yes, Your Honor. That's the second time you've used the term scrub, so I just want to start with this question, and that is, based upon your understanding of the record, give us from the record a definition of what scrubbed means in the context of this testimony, this trial. Well, we don't have a great one, Your Honor, because nobody from the FBI ever came in and testified that this is what we scrubbed out, or even we made sure that all the Brady material was there, or that it pertained to other investigations. We don't know what they kept out. Detective Myerson testifies, via hearsay, but it's at a pretrial hearing, I think, that the FBI told him that they scrubbed some things out, but that's really all that we know. It was never submitted... I'm sorry, Your Honor. It was never submitted for in-camera review or anything. All we have is Detective Myerson saying that the FBI said it was scrubbed for something. Thank you. Thank you, Your Honor. I believe that Detective Myerson's testimony that he only received three 30-minute recordings, and the facts revealed to the post-trial that it was about half an hour were the most reliable, but the bottom line is, we know that the state introduced selected excerpts between Mr. Ellis and Daquan White, and the full unedited recordings were never available to the defense. The FBI controlled the process. They kept the full raw audio. They screened and scrubbed the recordings, whatever that meant, and provided only selected material downstream to the parties. The state couldn't even avert that the recordings were complete or that the context was reliable, because they didn't have access to the full recordings either. It's no different than if a stranger had walked up to the prosecutor and handed them a tape that was labeled edited and spliced audio recordings. That would not be useful to the prosecution or admissible. The only difference here is that the stranger was wearing an FBI windbreaker. That created a Brady completeness problem that's the heart of this issue. The state wanted the benefit of using selected portions of recorded conversations to prove guilt, but the defense had no meaningful way to test whether those omitted portions changed the meaning or the context or impeached the state's interpretation or contained favorable Brady information. The trial court recognizes problems in real time. The court recognized and questioned how anyone could know if exculpatory or contextual material had been scrubbed out, and it recognized it had no practical way to evaluate the omitted material. So this was an admissibility problem, ex-ante, that the rules in case law already address and provide for. Rule 106 exists because excerpts can mislead when stripped of context. Brady and Kyles reinforced that prosecution cannot use government-gathered evidence while the defense is denied access to favorable or contextual material known to law and enforcement. And Rule 901 requires a foundation that the evidence is what the state claims it is. Not just that the FBI ran it over here and gave us something, but that the excerpts admitted at trial were accurate, complete enough to be fair, and not misleading. None of that happened here. Nobody testified to that. Dequan White didn't even remember the conversations, and Detective Meyerson could testify he received the recordings, but he couldn't testify that the selected excerpts fairly represented the full conversations from which they were taken. And like I said- Counsel, let me ask you a question. Did anybody ever explain why the FBI had scrubbed, and we take that to mean omitted or left out, that and why they didn't provide the full recordings to the state? Your Honor, I don't believe there's ever a clear answer to that. At one point, Mr. Barnard, Special Prosecutor, is asking Detective Meyerson, he says, isn't it true, and it's kind of in a hypothetical framing, isn't it true that sometimes the feds do this because they have parallel federal investigations going on? And Meyerson says, yes. Nobody says that's what happened here. And curiously, it would be curious if that applied here because this was initiated by state prosecution. Both of these participants, these conversations, were in federal custody on unrelated charges. But when Daquan White's girlfriend came to the prosecution, came to the police and said, Daquan has information about this, the state of Illinois went to the feds and said, you've got two guys in federal custody. We'd like you to put them together and see what happens. And Daquan White got whatever consideration Daquan White got. But so if the FBI scrubbed it to protect some other parallel investigation, that was still done all at the initiation of the state. And if that was the case, if the state wanted to, and again, we're all in hypothetical zone here, but if the federal government wanted to protect that, then they should have submitted it for in-camera review so that there's some kind of supervision of this instead of just kind of trust me, which is what the state is asking us to accept from the feds. So if a federal agent had come in and said, I've listened to all this and it was That wouldn't be nearly enough to satisfy the adversarial system, but it would have been more than we got in this trial. That's why a new trial is required. The jury heard central proof that it could not meaningfully be tested for completeness, could not be authenticated as fair and accurate, and could not be screened by the trial court for the very fairness concerns the court itself identified. The state relies on waiver because trial counsel said no objection when the exhibit was offered. And that just highlights the ineffective assistance of counsel that was Counsel's failure to object on the grounds of foundation completeness, the very issues identified by the court. I'm sorry, your honor, go ahead. I thought I was a question. I apologize. Okay. His failure to object on the very grounds that the court identified shows deficient conduct. And we know that it was prejudicial, right? Because without the overhear excerpts, the state's case is not overwhelming. There's no eyewitness that identifies Mr. Ellis as the shooting. There's no DNA or fingerprints at the scene that connect him to the crime. The state's theory required the jury to travel through a chain of inferences, a gun and medical treatment and a palm print. It all had to do with the Davenport shooting that connected him to just the Davenport shooting and the bullets from that shooting matching up to this. And then there's the district shooting evidence that should not have come in under issue number two. And then the state's interpretation of these conversations, which should not have come in under issue number three, which I hope we get to. The overhears supplied the narrow glue through the whole case. Admitting those excerpts without enforceable foundation and completeness safeguards had to affect the verdict here. So we're only asking the court to apply the rules that are already in place. When the state proves guilt through selected excerpts of a larger recorded conversation, and the full context is unavailable to the court and the defense, those excerpts cannot be admitted unless the state can establish reliable authentication and meaningful completeness. It's not a new rule. This is Brady concerns wrapped in rule 106 and 901. They were not applied here and a new trial is necessary just on the first issue. But turning to issue two, the district shooting should never have come in because it was cumulative and unfairly prejudicial. The state said it needed other crimes evidence to prove identity through the firearm. Even accepting that theory for the sake of argument, this Davenport shooting supplied that state's claimed identity link. The state argued that the same Glock was used in the charged homicide and later recovered in connection with the Davenport incident. The state also relied on palm print and hospital treatment to connect Mr. Ellis to the Davenport shooting. That's the firearm bridge. That's what connects this to the homicide of Mr. Smith. The state has now used its other crimes evidence to establish this theory of identity. Done. Once that Davenport evidence came in, the district shooting added very little probative value and massive prejudicial value. Ballistics either connected the firearm to the charge defense or they didn't, and that was all established through the Davenport. Adding another shooting didn't make that more reliable. What it did was tell the jury that Mr. Ellis was associated with another shooting months earlier, a separate inflammatory event involving different victims in a different setting. Well, counsel, what about motive, operation, design, those types of things? This is kind of a different situation where a person allegedly is shooting somewhat randomly at another group from a distance, undisclosed or hidden distance. So that sort of shows a pattern. Well, we've said a few different things there, your honor. Motive and design and then pattern, those are different. The state never offered it for any of those things. The state offered evidence for identity. There's no indication of motive that connects these two. The participants were completely different. Any motivations would be completely different. Design, same thing. There's nothing connecting this for design. If we're talking about pattern, then we get into trouble because if we're describing him as somebody who goes around shooting off guns, that invites a propensity inference. That's what we're worried about. If the state is offering it for that, that's flatly improper. And unfortunately, that's really all that's left with what's left because the state only offered it for identity. Identity was unnecessary at that point or at least satisfied to the extent that a 403 balancing of probity versus prejudice isn't really even close. So that type of inference is the type of reasoning that 404b forbids. The state cannot turn identity into propensity by saying same gun, same shooter over and over across unrelated shootings. At some point, the inference stops being identity and it's just he's the kind of person who shoots off his guns. And that line was crossed here. The state's response is that there was some complementary purpose between the two shootings that showed he had the gun before and after. But if before and after is enough, the state can stack violent other crimes evidence ad nauseam without regard to the proper balancing and the default rule that other crimes evidence is generally inadmissible. This would swallow the protections of rule 404b and 403. And crucially, when we do allow this type of thing, we require a properly given limiting instruction. No properly given limiting instruction was given here to mitigate the problem. The court recognized that IPI 3.14 is necessary, but it only gave it once before the trial starts, before the state began its case. They never gave this warning tied to any other crimes evidence at all, particularly the district shooting when it was introduced. And it was not included in the jury instructions. It went back to the jury. The final clean copy that went to the jury omitted this instruction. So we have evidence that invites a propensity inference and nothing telling the jury, hey, this particular evidence, don't take it for that. It was just, they were just fully allowed to take it for propensity. So- Counsel, I want to follow up on my question because I used an inartful word and pattern, but in talking about a common scheme or a plan or something of that nature, the court, even if the state introduced the evidence of the other shooting for the idea of identity, the court can allow that evidence, the exception to other bad acts, for any reason the court finds it to be admissible. Is that not true? The court can, but there needs to be a peppercorn of evidence to support that. There's nothing supporting a plan or a scheme. Again, these are different participants, different situation, a month or two separate. There's no- But if you have the ballistics all matching up in similar situations, might that not be evidentiary of a common design scheme, things? I suppose I'm not following because it would seem to me in this type of situation that is sort of novel, it does seem to be some type of scheme, suggestive of anyway, some type of scheme, pattern, not pattern, but you understand where I'm going. I do, Your Honor, but scheme has a definition in case law. There has to be a goal that's trying to be achieved by these two separate incidents. They're just not connected. There's no scheme. My point is the ballistic connects them. There is this connection. Which is identity, right? The ballistics shows it's offered for identity and that's satisfied through the Davenport shooting. We can't just bring in, if somebody has a boxing glove, we can't bring in every time he ever punched somebody just because he used the same boxing glove when he punched this person. Other bad acts, we keep them out for a reason. They're overly prejudicial. So you have to come in with a good reason. Again, modus operandi is very specifically defined in the case law. It's got to hit several points of similarity and just simply the weapon is not enough. It's been ruled not enough. I don't have the case law in front of me, but I looked at a lot of this. It doesn't satisfy MO. There's no scheme because there's no plan. There's no common participants or anything like that and there's no motive. So I think the state knew if anything, it would only be admissible for identity. That's the only reason they admitted it for and that was already satisfied by the other one. Thanks, counsel. I've taken enough of your time. You've answered. I appreciate it. Thank you, your honor. So, and I'll be just to briefly touch on the point. It's obviously was not invited error when defense called James Brewer to mitigate this. Brewer was in response to the state opening the door, calling a witness to say Mr. Ellis was there, but did not shoot anybody. Did not invite the error retroactively through time travel when the state inappropriately brought the evidence in the first place. So issue two is not whether about whether other crimes evidence can ever be admitted for identity or plan. Of course it can. The question is whether the state needed the cumulative and prejudicial district shooting after that Davenport situation already supplied that identity link. The jury and whether the value, excuse me, of whether that additional shooting evidence justified the risk, especially when that risk was unmitigated by a proper limiting instruction that the jury would convict based on propensity. So even if we get through 404B, we still got to get through 403. We still need to balance those. And there's just no objective view of this that puts that where the propensity greatly outweighs the prejudicial impact, which is what the test is. So the prejudicial impact propensity evidence was profound enough to require it in trial here. Issue three is narrower, but it matters because it shows how the first two were amplified. The state did not simply play the excerpts and allow the jury to decide what they meant. It had detective Gerskis certified as an expert in street slang and then used him to interpret conversations for the jury. This was error because the certification was too broad and the testimony went too far. This was not a limited explanation of discrete drug terms or gang member hierarchy or any terms of art. He was certified as in the broad field of street slang, which is just vernacular. Based on the word here, he acknowledged he had no formal linguistic training, no language interpretation training, no peer reviewed work, no reliable methodology between the sides talking to people in the community. In other words, the basis of his expertise was exactly what qualifies the jurors to sit in this case, being members of the community. He also acknowledged the slang changes. Counsel, his community is different than the jurors community. I hope not, Your Honor. His community includes people accused of crimes and other overhears and narcotics work. I understand your point about is he an expert, but I think we should be able to concede that he's more likely to understand some of this vernacular than the person on the street. I'm not sure why that's the case, Your Honor, because that's what vernacular means. Vernacular is the common parlance of the people on the street. If this is the way people on the street communicate, then any particular juror should be just as qualified as this expert in discussing this. Now, again, certain drug terms, maybe? Absolutely. Certain gang hierarchy or specific terms of art? Sure. But his testimony went far beyond that. He didn't just talk about guns. He reinterpreted and recontextualized a lot of common sayings that are present in African-American vernacular English. It's English that he's translating. He's a police officer, so we didn't bring in a professor of Farsi to translate Farsi. We brought in a non-independent person who works for the prosecution to translate something that the common people participate and communicate in regularly in a way that's most favorable for the prosecution. It's a combined problem. It's the fact that he's not independent and the fact that his expertise is not sufficiently different that it doesn't pervade the purview of the jury here. The state responds with cases involving drug terminology and gang terminology, but those cases don't authorize the general police expert in street slang. This would be the first case that ever recognized that or African-American vernacular English to narrate ordinary speech. Where does it end? Would a jury in Rockford or Chicago benefit from a farm or rural slang expert to explain a conversation between Larry the Cable Guy and Boomhauer from King of the Hill? We can cut this hair as finely as we want for every different age, ethnic, and social group in the state, which could be thousands. But the second problem is more insidious. Equating African-American vernacular English or street slang with gang terminology in order to push the square peg of this case to the round hole of case law is dangerous. Where did African-American come into play? Is that something you're taking on the record? I think it feels like that's something you've introduced to the argument. It is. It's my characterization, Your Honor. Yes, I don't think anybody said African-American vernacular English. So yes, please take that with the understanding that it's my description of it. Yes, Your Honor. If these conversations needed to be translated, then they need to be translated by an expert, as I said. The problems with Issue 3 really put a fine point on the unfairness of this trial. The jury heard selected recordings, it heard cumulative other shooting evidence, and then it heard a police expert explain the common everyday vernacular in these selected recordings in the way most favorable to the state. These errors all reinforce each other. And for those reasons, Mr. Ellis asked this court to reverse his convictions and remand for a new trial. Unless the court has any other questions about Issue Number 4, thank you for time. I'll speak with you again shortly. Thank you very much. Mr. Barrett? Good morning, Your Honors and counsel. I'd like to just kind of begin with an intro that will kind of take you, Your Honors, through the points that I'm wanting to address, and then we can start to field some questions and dig into the meat of that. So let me just try to get through this introductory portion first here. This case presents a fundamental question. Does a defendant who received 60 hours of overhear audio, whose own counsel billed 193 hours reviewing it, and who affirmatively told the court no objection when recordings derived from that discovery, get to manufacture a Brady violation and a completeness claim on appeal by simply ignoring that discovery exists? The answer is no. Furthermore, defendant's entire theory of error rests on the false premise that the evidence was closely balanced. That premise is demonstrably false. The evidence against this defendant spans the months before, the night of, and the weeks following Richard Smith's murder, and it's overwhelming. Taquan White, a childhood friend of this defendant, broke the case. White came forward offering crucial information that matched what investigators and ballistics experts found, testifying as an eyewitness to the August 2016 district shooting, where he observed defendant fire a nine millimeter Glock equipped with an extended magazine, shooting James Brewer in the face. The ballistics expert confirmed that the same Glock fired 15 of the 17 cartridge cases recovered from that scene, and all of the casings later recovered from the murder of Richard Smith. This overwhelming... Excuse me, I apologize for interrupting, and certainly it's, we're familiar with the facts, and I appreciate your introduction, but I have a question with respect to the first issue that opposing counsel addressed. How would you, how do you respond to the point that was made that without the rest of these overhears and material, that they really were not able to effectively address or cross-examine or attack what was introduced? And there may have been Brady material in there. How do we know? How did they know? How would you respond to that? Well, first of all, we don't have defendant who was a party to these conversations coming forward and saying, here's what I said. Let me clear this up. He was a party. This isn't about third parties here. This is about defendant himself and what he said. He was there. He was present during every conversation. So the fact that we're trying to rely on reportings that don't exist outside of this record, that's post-conviction land. And defendant is more than, more than able to bring a post-conviction petition if he thinks he has a claim that he said something exculpatory. This is a claim based on a record that included a neutral magistrate who reviewed Conway prior to this evidence being admitted for trial. Judge Conway reviewed for pertinence, all of this information. It wasn't just the FBI screening it out. And then, you know, as a buffer to that, defense counsel was certainly aware by the 60 hours of overhear material that provided context, that would have provided any necessary context for the 90 minutes that were ultimately used. Why was it not ineffective on trial counsel's part not to object? I mean, because there was no exculpatory content. There were 60 hours of material there. If any exculpatory content existed, he was free to put it in to clear up the 90 minutes that were used as a trial exhibit. The trial exhibit itself, People's Exhibit 24, that was a 90-minute excerpt from the larger body. And if there was any exculpatory content, defense counsel was privy to it and he could have put that in. So, there was no exculpatory content. And then also, defendant here, like I said, he was a party to these conversations. Before we go there, counsel, that's a whole other bag of worms. The larger body of recorded material, was that disclosed and handed over to the state pursuant to their pretrial discovery motion, which requested any written or recorded material with regard to the oral statements of the accused? The relevant and pertinent information screened through by Judge Conway, that was what was turned over. So, the answer is no. I mean, I understand your argument is, in camera, the court had this review and it's a neutral and all these good things. But in fact, the larger body of material was not handed over in total to the defense. The larger corpus of it was not, no. Thank you. But ultimately, this is not a case that was closely balanced in any way. This was an overwhelming case. That's the next step, counsel. But you seem to concede that the pretrial discovery motion was not adhered to. The information was not completely disclosed pursuant to what was requested by the defense. We can deal with that, but that seems to be where we start from. Well, the process screened out the relevant information and there was testimony from Detective Meyerson that the FBI process involves separating out conflicting cases and other ongoing investigations. And Judge Conway was privy to all this before it was released to the trial court. So, there was a screening process here. Judge Conway was privy to what he was given to review. He wasn't given everything to review. A third party, the FBI, said, we have determined relevance. We have determined what is applicable. Now, it's not a distrust of the FBI. It is simply, rather, that they are not an arbiter of what is relevant in this trial. That's the problem. Judge Conway did review it for pertinence and relevance to this case. You're telling me that he reviewed every single hour of the overhears? Not the largest, not the larger court. Well, that's the whole point. Somebody omitted some of the overhears, a big chunk of the overhears. And the only person that heard those was the FBI. I cannot understand why you continue to say that this was reviewed because it wasn't. Do you concede that the judge did not have the opportunity to listen to all of the overhears? Yeah. Certainly, Judge Church did not. Judge Conway received the relevant portions that— You keep using the word relevant. Who determined relevance? Right. Well, Your Honor— Who determined relevance? If we can turn to the overwhelming nature of the evidence, I would really like to— No. No. First, you'd answer that question. Who determined relevance? A third party, the FBI. And they turned over part of the overhears. Now, that might have—maybe that was perfectly done. But how do we test that? How do we know? And I'm not going to argue with you about whether or not this defendant looks dirty based upon the evidence that's available. The question is somebody else reviewed this information and decided what they were willing to give to the state. And if you don't see that as a problem, then I think you're misunderstanding what relevance and what evidence means. I don't mean that to be insulting. If we could just look at the confession, if we could look at what the substance of the overhears was that the defendant confessed. But we have Daquan White testifying that the defendant confessed. This was absolutely damning and overwhelming evidence based on a witness who broke this case. But, counsel, the point is, for all we know, before confessing, he was not denied involvement 15 times. And then, again, not to begrudge the FBI in any way, but maybe it was determined somewhere that those prior denials weren't relevant. They were the arbiter, the FBI. A criminal defendant sitting in custody on a case like this is relying on the FBI on relevance and not what the court determined. That's hard to take. Well, ultimately, it's reviewed for an abuse of discretion, and the trial court certainly had discretion here to put these in. And what we have to look at, too, is this district shooting. I disagree with counsel that the district shooting was just not necessary and it wasn't probative of anything. The district shooting- Well, I think the point was- The defendant had- Excuse me, counsel. The point was, opposing counsel's point was it was cumulative and prejudicial. So, if you want to respond to that, why was it not cumulative and prejudicial? Identity was established with the Davenport. The connection was established with the Davenport shooting. So, you want to start there, please? Yes, absolutely, your honor. Identity was not established. The defendant possessed this gun prior to the shooting. This puts the gun in his hand prior to the murder of Smith. That is very probative and very, very determinative of defendant's guilt in this shooting of Richard Smith. You know, guns on the street, people obtain guns on the street at various times, and defendant would definitely be claiming, if that didn't come in, that, well, if I did possess it, I came in contact with it after that shooting. I had nothing to do with Richard Smith. Richard Smith, his shooting turns on the ballistics, the ballistics that came back specifically from the district shooting. The district shooting was absolutely essential to that because it happened before Smith was murdered. That is very strong evidence and very probative of defendant's guilt in this case, and it also contributes to the overwhelming nature of the evidence. This is a case, also, so defense relies on Bedoya, and that case involved unrelated shootings at unoccupied buildings, and there was no forensic connection in that case. Here, we have forensic ballistics that match the firearm, the specific firearm, to that weapon, and then Dequan White's testimony about the 9mm Glock with the extended magazine, that lines up perfectly with what they found. Dequan White was trustworthy on these points, on the information that he testified to. So, we have ballistics, we have witness testimony from Dequan White, it matches, and we have the gun in his hand prior to the murder. This is overwhelming evidence here, and then we also, after the shooting, defendant's still in possession of it. He didn't get rid of it. So, defendant's palm print is found on the window, the rear or the driver's side rearview mirror, lifted from the driver's side of that seat, and we know from the tapes, the defendant was driving that vehicle, the white Pontiac. I was driving that white thing, he said. So, the evidence is corroborated. What we got from these overhears is all corroborated by the evidence that was actually obtained in the case. We don't have spliced in misinformation. What we have is information that's consistent, but what was borne out by the actual facts and evidence in this case. Counselor, not to leave this issue, but just a reminder, were you going to address the foundational issues that were brought up with regard to the audio? Yes, Your Honor. The surrounding circumstances of the audio that was tendered, it was reviewed by a magistrate, and there were independent indices of reliability. We know based on the evidence, based on the testimony from Meyerson, based on the testimony of White, that there were independent verifications of what was contained on the tapes. And that was more than sufficient to show the reliability of those overhears. But even if we overhears, even if we exclude the overhears, we have overwhelming evidence of guilt. We get there strictly through Duquan White's testimony, the defendant confessed to the murder of Richard Smith. We have ballistics matching it before, during, and after. And we have defendant shot in the Davenport Hospital right near where that murder weapon was discovered. So, that is very strong evidence that this defendant shot and killed Richard Smith. I want to turn just briefly, if I can, to Detective Gursky's. So, he had 17 years of experience that included work on the DEA and FBI task forces. And his testimony was bearing on genuinely technical terms here. The drug quantity is like 3.5, meaning three and a half grams. The firearm references to claps, to describe that that meant guns. And then to put context on a phrase like there's a body on that bitch, meaning there is a victim on that gun. The jury is not expected to understand what that means. So, to qualify him as an expert or experienced in the context of these phrases was absolutely within the discretion of the trial court. And Gursky's was talking about technical terms. The jury was not privy to these terms. So, I think that puts that to rest. And then in terms of, if I can just turn to argument four, every seated juror affirmatively confirmed that they understood and accepted the principle that defendant's decision not to testify could not be held against him. Even if we get past or notwithstanding the pre-amendment language that was used by the trial court, what we look for here is whether the evidence was closely balanced. Under Neal, the dispositive question for first-pronged plain error is whether the evidence was closely balanced. For all the reasons this court has already heard from me this morning, it wasn't. And the only reason the Burton case, which defendant relies on, was reversed was because that was a credibility contest. There was no conclusive testimonial evidence in that case. Here, the evidence is not closely balanced. This is an overwhelming evidence case. It's anchored to objective forensic proof, witness testimony, defendant's own admissions, confession that came in through Daquan White. This is squarely in line with Neal's affirmance and not Burton's reversal. I have a question regarding the expertise of the police officer. How was this established other than 17 years of experience, which is impressive and probably gave him a better understanding of these words than some people would have. But what else was explained regarding his qualifications? Well, this is an officer that had street experience, that was conversant in language that was used in criminals, local criminals, people that are currently using these terms and dealing with each other. The whole purpose of these terms is to make them so that they are not understandable to outsiders. I understand exactly what you're saying about the interacted with defendants, criminals, people in this community. I just want to know what the trial court considered. I have a lot of experience. I've been doing this for 17 years. I'm conversant with the vocabulary that these people use. Well, Detective Gerskis was directly working with and on the street working with interacting with criminals who use these terms. And he testified to that. Yes. It wasn't just assumed because of the 17 years of experience. He testified to his experience and familiarity with these terms. Thank you. I'm sorry. It looks like I am I over on time here? No, you have another minute and 12 seconds. Okay. There's a minus when I'm over, right? Right. Correct. A little time left. All right. Well, if there isn't any other questions, I would ask that your honors affirm the convictions and the sentences of this defendant for all the reasons that people have stated. Thank you very much. Mr. Weller, your rebuttal. Thank you, your honors. First, I think it's important to... I want to make sure that counsel and everybody here understands what Judge Conway's role here is. Judge Conway reviewed the subset of recordings for responsiveness to his warrant. He didn't review anything for relevance to the case because no case existed yet. No charges had been filed at that point. As your honors know, when there's an overhear warrant, it comes back to the judge. The judge reviews it for responsiveness to the warrant. And that's it. Not for relevance to any particular charges. Counsel, we're aware that, again, the FBI made the determination on relevance and then handed over what it had scrubbed, or for lack of a better term, decided would go to the state. I understand. I'll move on then. I want to point out, counsel wants to shift the burden to the defense of establishing relevance and completeness of the state's evidence. That's not how it works. He keeps saying, well, the defendant could have stood and talked about that. That's not how it works. Foundation is a conditioned precedent to admission by the proponent of the evidence. It's not up to the other side to come in and say, that foundation was sufficient or insufficient. It was incumbent upon defense counsel to say, hey, you're admitting all this in with no foundation whatsoever. And counsel didn't do that. There's no question that that was deficient. And there's no real question that this evidence that came in was so prejudicial. I mean, counsel relies upon this confession, the strength of this confession. Every time he relies on that to talk about how there's overwhelming evidence, what he's doing is establishing prejudice for the ineffective assistance that was rendered by counsel. So we don't look at the strength of the evidence that's in dispute to decide whether or not that evidence should have come in. We have to look at the rest of the evidence. So as much as counsel wants to focus on the confession, it's kind of a non-starter. It doesn't matter because that exactly is the evidence that we're talking about, whether it should have come in in the first place. Again, Daquan White couldn't remember anything about the conversations. So he didn't establish any indicia of reliability. There was no indicia of reliability. Detective Meyerson came in and said, the FBI gave me this. They told me that they edited it. They told me that they scrubbed it. Here you go. And the Special Prosecutor Barnard submitted his evidence. There was absolutely no indicia of reliability. There's no foundation. It was objected to initially in the pretrial, but to the extent that his waiver at the time of trial when they admitted the actual exhibit, that was deficient and it was prejudicial. So we definitely have ineffective assistance. But again, we also have due process problem altogether with the fact that this evidence was never turned over to the defense. And when the court recognizes this problem, and the court says, I have no way of adjudicating the Brady issues or anything else about this or completeness, and then lets it in any way, the court has abdicated discretion. The court has said, here's a problem. I don't have a way to resolve it. I'm just going to let it all in. That is not discretion that needs any deference from us. An abdication of discretion is an abuse of discretion. That's black and white case law. So with respect to the second point that was made, opposing counsel, counsel for the state indicated that in their view, the evidence regarding the district shooting was not cumulative. You argued that was made. How do you respond to that? Well, again, I would ask what was established at the district shooting that wasn't established with the Davenport shooting? Because all we have is a connection to the firearm. We've established that at some point, Mr. Ellis was in a situation where there have been shootings involving this gun. All that they've done is bring in, so I'm not saying that there's no relevance. Here, we have another instance where we have a witness saying he used that same gun, but the overwhelming prejudice keeps this out under 403, and the probity of that evidence is so small compared to the Davenport evidence that it's not really enough to get in under 404B, and it certainly should have been kept out under 403, because the little bit of relevance that there is vastly outweighed by the propensity evidence inference that was not at all mitigated by any kind of limiting instruction. So this is a prime textbook example of 403, where we have to admit there's some relevance, but if ever a case where there was too much inference for propensity that was not mitigated, this is it. This is a case of 403. The counsel wants to talk about moving to the third issue, that things like there's a body on that is a technical term. I guess I disagree. That's an idiom, right? It's not a technical term. These are a bunch of idioms. Frankly, Your Honor, Justice Connect, I don't think there's anything to suggest that these terms are used so that they're not understandable by outsiders. These are terms used in the community. They're idioms that they use that I may not use. I have idioms that I use that are hokey white guy idioms that they might not use. So these are not technical terms. They're idioms, and there's no case law saying we get idiom translators in, especially from the police. Briefly, I'm sorry. I think your time is up, counsel. I understand. Thank you, Your Honor. Appreciate your time. All right. Thank you both for your excellent arguments this morning. The court will take the matter under advisement and render a decision in due course. Court stands in recess at this time.